210 F.2d 263
 NATIONAL MFG. CO. et al,
v.
UNITED STATES.
GREAT WESTERN PAINT MFG. CORP.
v.
UNITED STATES.
MID-CENTRAL FISH CO.
v.
UNITED STATES.
WESTERN MERCANTILE CO.
v.
UNITED STATES.
COUCH TRACTOR & EQUIPMENT CO.
v.
UNITED STATES.
CHARLES P. SHIPLEY SADDLERY & MERCANTILE CO.
v.
UNITED STATES.
 Nos. 14875, 14901-14904, 14894.
 United States Court of Appeals, Eighth Circuit.
 Feb. 8, 1954.
Rehearing Denied in No. 14894.
March 5, 1954.
 
 Clay C. Rogers and Byron Spencer, Kansas City, Mo. (James W. Benjamin, Joseph J. Kelly, Jr., Gordon Leonard, Rogers, Field & Gentry, Spencer, Fane, Britt & Browne, and Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., on the briefs), for appellants Nat.Mfg.Co. and others.
 Roy K. Dietrich, Kansas City, Mo. (Edwin Earnshaw and Dietrich, Tyler & Davis, Kansas City, Mo., on the brief), for appellant C. P. Shipley Saddlery & Mercantile Co.
 Warren E. Burger, Asst. Atty. Gen. (Edward L. Scheufler, U.S. Atty., Kansas City, Mo., Paul R. Shy, Asst. U.S. Atty., Chillicothe, Mo., and Paul A. Sweeney and Morton Hollander, Attorneys, Department of Justice, Washington, D.C., on the briefs), for appellee.
 Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.
 WOODROUGH, Circuit Judge.
 
 
 1
 These six appeals are taken to reverse judgments which dismissed actions sought to be maintained under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., to recover damages from the United States for property loss and damage suffered by the plaintiffs at their places of business in Kansas City, Missouri, in the course of the July, 1951, Kansas River flood.[1] A motion for summary judgment for defendant under Rule 56, Fed. Rules Civ. Proc. 28 U.S.C.A, on the ground that 'the pleadings now on file indicate there is no genuine issue of fact and that the defendant is entitled to judgment as a matter of law', was sustained in each of the cases. Five of the appeals have been consolidated for all proceedings in this court and the sixth appeal (No. 14,894) was argued orally with the others. A single brief for the government is made applicable to all the appeals.
 
 
 2
 The complaint of National Manufacturing Company, followed in the four cases consolidated with it on appeal, alleged that the Kansas River is a navigable stream subject to federal jurisdiction with its head waters and tributaries extending into the states of Nebraska, Colorado and Kansas, and flowing into the Missouri River at Kansas City; that extensive industrial and residential areas lie adjacent to the river and occupy lowlands within and near Kansas City, Missouri; Kansas City, Kansas; Lawrence and Topeka, Kansas, and all along the course of said Kansas River, which said lowlands have at various times been subjected to overflow and inundation by flood waters of said Kansas River; that the United States in exercising its jurisdiction over said river through its various departments and agencies have constructed flood control dams, levees, dikes and other works, recognizing the dangers and disasters of floods of said river and seeking to minimize and prevent the same; that the United States through its various departments, including the Department of Commerce, the section of Geological Survey of the Department of the Interior, the Weather Bureau of the Department of Commerce, the River Forecasters Division of the Weather Bureau, Bureau of Reclamation, the Department of Defense and the Army Engineers of the Department of the Army, has for many years as required by statute, departmental rules and regulations, the Appropriation Acts of Congress, custom and practice, made surveys, forecasts, recordings, and gathered information concerning the waters of the River, and its rise and fall, rainfall and precipitation through its entire course, including the course of its tributaries, all for the purpose of gathering information of a reliable nature to disseminate and give to, and for the protection of, various persons, firms and corporations whose lives and property would be and are, subject to the influence of, and rise and fall of said River, and particularly the floods of said River.
 
 
 3
 The United States and its various departments and its officers, agents and employees of said departments, at all times, knew that the information and knowledge gathered and obtained by said various departments and the officers, agents and employees of said departments should be accurately collected and accurately and diligently transmitted as information to all of the persons, firms and corporations whose property and lives might be affected by the flood waters of said River. And defendant, its said officers, agents and employees knew that the public, generally, and the persons for whose benefit this action is prosecuted in particular would rely upon and would act upon the information supplied and disseminated, as aforesaid, in making determinations as to the necessity of the removal or protection of property, chattels and effects from and within locations subject to inundation by the flood waters of the Kansas River.
 
 
 4
 About the 9th day of July, 1951, the said Kansas River entered the flood stage which said action of said river was well known to and recognized by the defendant, its officers and agents and employees, and particularly the Corps of Army Engineers and the Geological Survey Section and River Forecasters of the Weather Bureau. After said river had entered said flood stage, the defendant, through its said department and agencies, with offices and headquarters located in Kansas City, Missouri, Kansas City, Kansas, Lawrence, Kansas, Topeka, Kansas, and elsewhere along said River, and while said officers, agents and employees of the defendant were acting within the scope of their offices and employment, committed such negligent and careless acts and omissions, and so carelessly and negligently disseminated misinformation respecting the course and action of the flood waters of said River, and so negligently and carelessly omitted and failed to disseminate accurate, reliable and factual information readily available, and as a direct result of said negligent acts and omissions, and also as a direct result of negligent assurances, all as hereinafter more particularly alleged, the plaintiffs herein, and others for whose benefit this action is brought, as hereinafter alleged, were misinformed concerning the stage of said River and flood waters flowing therein, and of the certainty that the flood waters of said River would overflow the dikes and levees along the course of said River and particularly, at Kansas City, and would enter the lowlands and flood and overflow and damage and destroy property within said lowlands.
 
 
 5
 After the Kansas River had entered the flood stage, and when defendant and its said officers, agents and employees knew, or, in the exercise of ordinary care, should have known, that the said River would greatly overflow its banks, dikes and levees and would inundate the Southwest Industrial and Central Industrial Districts of Kansas City and adjacent lowlands, the said officers, agents and employees of the United States, while acting within the scope of their employment, committed such negligent and careless acts and omissions in carelessly and negligently publishing, circulating, broadcasting and disseminating misinformation respecting the course and action of the flood waters of said River, and in negligently failing and omitting to publish, circulate, broadcast, disseminate and transmit accurate and reliable information readily available to such officers, agents and employees, and to defendant, as more particularly hereafter alleged, that plaintiff and others in like and similar circumstances were greatly misinformed and misled by such negligent acts, omissions and conduct to their great damage as hereinafter specified.
 
 
 6
 On the 9th, 10th, 11th, 12th and 13th days of July, 1951, the defendant, its officers, agents and employees, and particularly the Army Engineers, River forecasters, Weather forecasters, members of the Geological Survey Section, located and having offices in Kansas City, Missouri; Kansas City, Kansas; Lawrence, Kansas; Topeka, Kansas and elsewhere, had facts and knowledge available to them, which facts and knowledge definitely and conclusively indicated and showed that said Kansas River was reasonably likely to, and would greatly overflow its banks and dikes and levees, on the 13th day of July, 1951, and would overflow and inundate the great Industrial Districts, both in Kansas City, Missouri, and would overflow and inundate plaintiffs' places of business and would ruin, damage and destroy plaintiff's portable and removable and other property.
 
 
 7
 All of said information, facts and knowledge were readily accessible and available to said officers, agents and employees of defendant, and it was the duty of said officers, agents and employees to assemble said facts, knowledge and information, and to inform plaintiffs and all others, of the likelihood and danger and imminence of the overflow and flooding of said Kansas River, and, notwithstanding the existence and availability of said facts, information and knowledge, the defendant and its said agents, officers and employees, carelessly and negligently,
 
 
 8
 (a) Omitted, failed and neglected to accurately assemble, analyze, collect and distribute said information and inform the plaintiffs and all others similarly situated that said Kansas River was reasonably certain to greatly overflow its banks and said dikes and levees and inundate all of the said low lying areas, including the Southwest Industrial District and the Central Industrial District;
 
 
 9
 (b) The defendant, its said officers, agents and employees negligently and carelessly assured the plaintiffs and all others similarly situated that said Kansas River would not overflow its banks and said dikes and levees, and that said Southwest Industrial District and Central Industrial District would be, and was, safe from said flood waters, and that there would be no reason for plaintiffs and others similarly situated to remove the portable and removable goods from said lowlands, or to take other precautions respecting the property therein located;
 
 
 10
 (c) The defendant, its said officers, agents and employees, by publication of assurances of safety, and by failure to warn of danger, negligently and carelessly pursued a course of conduct calculated to abate vigilance on the part of the plaintiffs and others similarly situated and to cause plaintiffs and others to fail to remove such portable and removable property lying within the lowlands and subject to the flood waters of said River, or to take other precautions with respect to their said property within said areas;
 
 
 11
 (d) The defendant, its said officers, agents and employees negligently violated the duty to refrain from publishing, distributing and broadcasting and disseminating misinformation concerning facts which, by the exercise of ordinary care, it was their duty to know, and which facts would and should have charged defendant, and its said officers, agents and employees, with knowledge that said River would be reasonably likely to overflow its banks and inundate all of said areas.
 
 
 12
 As a direct result of the negligent acts and omissions of the defendant and its said officers, agents, servants and employees as hereinbefore specified, the plaintiffs and others in like situation were led into the feeling of security that the said Kansas River would not overflow its banks and dikes and levees and, therefore, the plaintiffs and others in like and similar situation did not remove from the flood area the portable and removable goods and property within said area, and did not take precautions with respect to other property, when the plaintiffs and others could have, and would have, except for the negligence of defendant and its employees, removed the portable and removable goods out of the flood area, and would have taken precautions with respect to other property, and would thereby have protected and prevented damage to their said goods.
 
 
 13
 (a) As a direct result of the said negligence of defendant, its said officers, agents and employees, the removable and portable goods, wares and merchandise in plaintiff National Manufacturing Company's business establishment were flooded and inundated by the waters and oil, mud, muck and debris carried therewith and said goods, wares and merchandise were damaged, ruined and destroyed to said plaintiff's damage in the sum of Three Hundred Thousand ($300,000) Dollars.
 
 
 14
 The complaint of the Shipley Company in No. 14,894 alleged in two counts that the defendant through its agents, the Weather Bureau, Department of Commerce, the Corps of Army Engineers, the Department of Interior and the Department of Agriculture, did in the period from July 8th to July 13th, 1951, inclusive, and for a long time prior thereto undertake under the Statutes of the United States to collect, compile and interpret rainfall and river information and that by reason of various Acts of Congress and rules and regulations of the various departments named, as well as by long standing custom and usage, the government had, and had assumed the duty of furnishing information of river stages and warnings of flood to the plaintiff as well as to other members of the public; that defendant had regularly established a system of weather reporting and observation of river stages and rainfall in the watershed of the Kaw River which river flows past the Central Industrial District and from inundation by overflow from which river the said district and Plaintiffs' property was and is ordinarily protected by dikes and levees and also a system of observing and predicting the movement of crests of high water in said river.
 
 
 15
 That from on or about July 8, 1951 to July 13, 1951, and for a long time preceding said dates, the defendant, its agents, servants, and employees, were under the duties as aforesaid, statutory and by regulation, and in addition to the performance of such statutory duties, the defendant, its agents, servants and employees had by long standing custom and holding out assumed the duty of collecting information on rainfall in the Kaw River watershed and data on river levels, furnishing information and warnings of the stages and progress of flood crests on said river to the plaintiff as well as to others located in the said Central Industrial District, and depending on such information in their trade and commerce, and the defendant and its agents and employees knew at all the times alleged that the plaintiff as well as others relied upon the defendant for said information and warnings. Plaintiff further states that on or about July 11, 12, and 13, 1951, the defendant knew that the said Central Industrial District and the property of the plaintiff therein was threatened by a flood of the said Kaw River and that the said personal property of the plaintiff was in danger of destruction and damage thereby and defendant knew of the danger of flood at least twenty hours before such flood actually occurred, but negligently failed to warn the plaintiff of such fact contrary to its duty, both statutory and assumed, so that on the said July 13, 1951, because the defendant, its agents, servants and employees had negligently failed to perform these duties and to warn the plaintiff, the said Kaw River flooded over the levees and dikes surrounding the said Central Industrial District without warning by the defendant, its agents, servants and employees and destroyed and damaged personal property of the plaintiff of the fair and reasonable value and to the extent of.$49,499.53, and plaintiff alleges that if defendant had so warned plaintiff twenty hours before when such river stage became known to defendant, as plaintiff has stated hereinabove, plaintiff could have removed all of its said property to a place of safety and avoided said loss.
 
 
 16
 Plaintiff for its cause of action and for Count Two of this complaint and in the alternative to Count One set forth above, further states that from on or about July 8, 1951, to July 13, 1951, and for a long time immediately preceding said dates, the defendant, its agents, servants and employees, was under the statutory duty as aforesaid, to collect information on the rainfall in the basin of the Kaw River, and the depth, stages, crests and movements of crests of high water in the said River and was required by its duly published regulations, and also by long standing custom and holding out to furnish flood and river information and warnings and information on the height and speed of movement of crests of high water in said River to the plaintiff as well as to others located in the said Central Industrial District and to use ordinary care in performing such duties, and the defendant and its agents, servants and employees knew at all times alleged that the plaintiff as well as others were relying upon the defendant for said warning and information. Plaintiff further states that on or about July 11, 12 and 13, 1951, the defendant by the exercise or ordinary care knew or should have known from all of the hydrologic data which it had collected that the said Central Industrial District and the property of the plaintiff was threatened by a flood of the said Kaw River and that the said property of the plaintiff was in danger of destruction and damage thereby, and defendant knew or should have known of the danger of flood in sufficient time to warn the plaintiff of such fact so that plaintiff could avoid such loss, but that contrary to its duty and the degree of care required of it, such duty being both statutory and assumed, defendant, its agents, servants and employees negligently failed to use ordinary care to perform these duties and performed its duties negligently, and the said Kaw River thereafter without such warning or information by the defendant to plaintiff- flooded the said Central Industrial District and destroyed and damaged the personal property of the plaintiff of the fair and reasonable value and to the extent of.$49,499.53, but plaintiff alleges that if defendant had so warned plaintiff when in the exercise of ordinary care it knew or should have known of the flood stage as aforesaid, there would then have been sufficient time for plaintiff to have removed all of its said property to a place of safety and avoided such loss.
 
 
 17
 Damages were laid at about a million dollars in the consolidated cases and at $49,000 in the other case, but cases of like nature involving very great sums are awaiting the outcome of these appeals.
 
 
 18
 It was not charged in either of the complaints here that the United States was liable to any of the plaintiffs because the Kansas River overflowed the banks, levees and works within which it was normally confined, but the allegations of the complaint in each of the consolidated cases were limited to the effect that the United States became liable because the Weather Bureau and other federal agencies (1) negligently assured the plaintiffs immediately prior to the flood that the river would not overflow and (2) negligently omitted and failed to give the plaintiffs notice and warning of the impending overflow in time for them to remove their movable property from the flood area. In the Shipley case the plaintiff has relied on the second claim.
 
 
 19
 The gravamen of the plaintiffs' cases was that the Federal Tort Claims Act should be so interpreted as to impose responsibility upon the United States for flood damage to plaintiffs' movable property in these cases because, as alleged, the United States was negligent in making or withholding Kansas river stage and flood forecasts.
 
 
 20
 The position taken for the government in the trial courts and reasserted here is that (1) recovery in these actions is barred by Section 3 of the Act of May 15, 1928, entitled 'An Act For the control of floods on the Mississippi River and its tributaries, and for other purposes' which declares that 'No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place'. 45 Stat. 534, 33 U.S.C.A. § 702c. It was and is also contended for the government that (2) the Federal Tort Claims Act under which the actions are sought to be maintained does not repeal these quoted provisions of Section 3, and (3) that said Tort Claims Act does not accord a right of action against the United States for the damages here alleged. Furthermore, that (4) the Exception provisions of Sections 2680(h) and (5) 2680(a) of that Act bar recovery of the instant claims by express exclusionary language.
 
 
 21
 1. The bar of Section 3 of the 1928 Act.
 
 
 22
 The 1928 flood control Act authorizing appropriations in excess of $300,000,000 for flood control work on the Mississippi River provided for the preparation and submission to Congress of 'Projects for flood control on all tributary streams of the Mississippi River system subject to destructive floods' including 'the Missouri River and tributaries'. 33 U.S.C.A. § 702j. In the later Flood Control Act of June 22, 1936, 49 Stat. 1570, 1588, Congress 'adopted and authorized to be prosecuted' as 'works of improvement, for the benefit of navigation and the control of destructive flood waters and other purposes' hundreds of flood control projects in all parts of the country including 'levees and flood walls to protect people and city property' and 'Kansas Citys on Missouri and Kansas Rivers in Missouri and Kansas'. Congress also affirmed the application to the 1936 Act of the general provisions of the 1928 Act including Section 3 by providing, Sec. 8, that:
 
 
 23
 'Nothing in this Act shall be construed as repealing or amending any provisions of the Act entitled 'An Act for the control of floods on the Mississippi River and its tributaries, and for other purposes,' approved May 15, 1928, or any provision of any law amendatory thereof.' 33 U.S.C.A. § 701e.
 
 
 24
 Thus it appears on inspection of the two flood control Acts referred to that when Congress entered upon flood control on the great scale contemplated by the Acts it safeguarded the United States against liability of any kind for damage from or by floods or flood waters in the broadest and most emphatic language. The cost of the flood control works itself would inevitably be very great and Congress plainly manifested its will that those costs should not have the flood damages that will inevitably recur added to them. Undoubtedly floods which have traditionally been deemed 'Acts of God' wreak the greatest property destruction of all natural catastrophies and where floods occur after flood control work has been done and relied on the damages are vastly increased. But there is no question of the power and right of Congress to keep the government entirely free from liability when floods occur, notwithstanding the great government works undertaken to minimize them. Congress included Section 3 in the 1928 Act and carried it forward into the 1936 Act and others with intent to exercise that power completely and to absolutely bar any federal liability.
 
 
 25
 It was not indicated in the 1928 Act that Congress expected to carry on the federal flood control projects without imposing upon the United States certain obligations to affected owners of property. The constitutional prohibition against the taking of private property for public use without just compensation was kept in view, U.S. v. Sponenbarger, 308 U.S. 256, 60 S.Ct. 225, 84 LEd. 230, and provision for compensation to be paid to landowners in certain circumstances is contained in the same section 3 which prohibits any federal liability for damage from or by floods or flood waters-[2] The Federal Tort Claims Act of August 2, 1946, had not been passed in 1928 or 1936 and the government then had a certain sovereign immunity from suit for torts but when Section 3 is read in its context it is clear Congress meant by it that damages from or by floods or flood waters should not afford any basis of liability against the United States regardless of whether the sovereign immunity was availed of or not. The declaration of Section 3 negates the existence of a cause of action against the United States in the situation covered by it.
 
 
 26
 Undoubtedly that absolute freedom of the government from liability for flood damages is and has been a factor of the greatest importance in the extent to which congress has been and is willing to make appropriations for flood control and to engage in costly undertakings to reduce flood damage.
 
 
 27
 The plaintiff in these actions argue that negligence of government employees was a proximate cause of their damages but they include in their complaints that the damages involved resulted from the fact their goods, wares, and merchandise 'were flooded and inundated by the waters and oil, mud, muck, and debris carried therewith and * * * were damaged, ruined, and destroyed' (National's complaint). In the Shipley Company's complaint it is alleged that 'the said Kaw river' 'flooded the said Central Industrial District and destroyed and damaged the personal property of the plaintiff'. Some such allegations are necessary to present the cases. But it is in just such a situation that the language of Section 3 plainly bars recovery against the United States. The section does not limit the bar against such recovery to cases where floods or flood waters are the sole cause of damages. It does bar liability of any kind from damages 'by' floods or flood waters but it goes further and in addition it bars liability for damages that result (even indirectly) 'from' floods. The use of the word 'from' in addition to 'by' makes it clear that the bar against federal liability for damages is made to apply wherever floods or flood waters have been substantial and material factors in destroying or damaging property. The language used shows Congressional anticipation that it will be claimed after the happening of floods that negligence of government employees was a proximate cause of damages where floods or flood waters have destroyed or damaged goods. But the section prohibits government liability of 'any kind' and at 'any place'. So that uniformly and throughout the country at any place where there is damage 'from' or 'by' a flood or flood waters in spite of and notwithstanding federal flood control works no liability of any kind may attach to or rest upon the United States therefor.
 
 
 28
 Counsel for the government have been at pains to demonstrate from records of legislative hearings, debates, reports and action taken by Congress that Congress has consistently adhered to the basic concept of nonliability of the government declared in Section 3 of the 1928 Act carried forward in the 1936 Act.[3] Many attempts have also been made in the courts to impose liability upon the United States for flood damages but such claims have been uniformly rejected by the courts. Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414; Jackson v. United States, 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363; Sanguinetti v. United States, 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608; United States v. Sponenbarger, 308 U.S. 256, 60 S.Ct. 225, 84 L.Ed. 230; Goodman v. United States, 8 Cir., 113 F.2d 914.
 
 
 29
 In Grant v. Tennessee Valley Authority, D.C., 49 F.Supp. 564, flood damage claims, though based on negligence of government employees and asserted against the Authority which is subject to suit, were denied. In granting defendant's motion for summary judgment the court said, 49 F.Supp. loc. cit. 566:
 
 
 30
 'By a long line of cases it has definitely been settled that neither the government nor its instrumentalities would have to respond in damages arising in the development and maintenance of waters for purposes of navigation and flood control, including claims for negligence. It may be noted that this position is not because of governmental immunity from suit but on the grounds of public policy.'
 
 
 31
 Similarly, in Atchley v. Tennessee Valley Authority, D.C.N.D. Ala., 69 F.Supp. 952, 954, a motion for summary judgment was again granted, the court pointing out that the principle of nonliability for flood damages 'is not based upon the immunity to suit of the United States' and 'applies whether the alleged liability is predicated on nuisance, negligence or other tortious conduct.'
 
 
 32
 It is contended for the appellants that Section 3, which has been carried forward as Section 702c of the Code under a heading 'Mississippi River,' is not applicable to the Kansas River or its flood damage, but the point appears to be without merit. The words of the section, 'floods or flood waters at any place', in the context of the Act and the succeeding flood control Acts to which the section is extended and which legislate concerning flood control projects throughout the entire country, specifically include the Kansas River and its floods and flood waters. The fact that the words Mississippi River 'have lingered on in the successive editions of the United States Code is immaterial.' Stephan v. United States, 319 U.S. 423, 426, 63 S.Ct. 1135, 1137, 87 L.Ed. 1490; Wong Yang Sung v. McGrath, 339 U.S. 33, 51, note 33, 70 S.Ct. 445, 94 L.Ed. 616.
 
 
 33
 It must be held that Section 3 as it stood at the time of the enactment of the Tort Claims Act of August 2, 1946, would completely bar these actions.
 
 
 34
 2. The government's contention that the Tort Claims Act does not repeal Section 3.
 
 
 35
 The Act contains a list of the statutes which it declares 'are hereby repealed', 60 Stat. 842, 846, 847, and the list so expressly repealed does not include Section 3 of the 1928 Act. The contention for appellants is that there was repeal by implication but when consideration is given to the basic importance of Section 3 to the vast federal flood control appropriations and undertakings, it should not lightly be assumed that the fundamental policy was reversed by mere implication with nothing said about it. 'It is a cardinal principle of construction that repeals by implication are not favored.' United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181. A long settled public policy is not to be overridden by the general terms of a statute which does not show with certainty a legislative intent to depart from that policy. United States v. Sweet, 245 U.S. 563, 572, 38 S.Ct. 193, 62 L.Ed. 473.
 
 
 36
 3. The government's contention that the Tort Claims Act does not authorize the action.
 
 
 37
 The Tort Claims Act contains no expressions which indicate affirmatively that Congress intended to depart from the established prohibition of federal liability for any damages from or by floods or flood waters at any place. The imposition of such a liability could not be justified in the face of that positive prohibition without some clear mandate from Congress and none such is to be found in the Act. As stated by the Supreme Court in Feres v. United States, 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152, in rejecting other negligence claims under the Tort Claims Act, 'We cannot impute to Congress such a radical departure from established law in the absence of express congressional command.'
 
 
 38
 The Act accords,
 
 
 39
 'jurisdiction of civil actions on claims against the United States for money damages * * * caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' 28 U.S.C.A. § 1346.
 
 Section 2674 provides:
 
 40
 'The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.'
 
 
 41
 It is settled in Feres v. United States, supra, quoted in Dalehite v. United States, 346 U.S. 15, 43, 73 S.Ct. 956, 972, 97 L.Ed. 1427, that the Tort Claims Act 'did not create new causes of action where none existed before. * * * Its effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities.'
 
 
 42
 It must be held that these actions are attempts 'to visit government with novel and unprecedented liabilities.' Heretofore the great contribution of the United States to the struggle that has continued for generations and will long continue, to conquer floods, has been made on the basis of federal nonliability for flood damages. That has been the condition of the government's contribution. There is no cause of action for recovery of damages from or by floods or flood waters. The contention that such a cause of action has been accorded by the Tort Claims Act may not be sustained.
 
 
 43
 4. The government's contention that the instant claims are based on alleged negligent misrepresentations and are therefore barred by the Exception of Section 2680(h) of the Tort Claims Act.
 
 
 44
 That section excludes from the coverage of the Act-
 
 
 45
 'Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.'
 
 
 46
 The complaints herein do not specifically name the government employees whose negligence is alleged to have been a proximate cause of the damages sought to be recovered from the government. But it appears that the complaint is not directed against any employees engaged in any flood control construction and is confined to the matter of flood forecasting. It is alleged that the government employees 'carelessly and negligently disseminated misinformation respecting the course and action of the flood waters'; that 'as a direct result of negligent assurances' the plaintiffs 'were misinformed'; and that the (government) employees negligently and carelessly assured the plaintiffs that the river would not overflow. In this court appellants in the consolidated cases reiterate their reliance on the contention that the government employees 'negligently disseminated misinformation and assurance of safety regarding the stage, condition and flow of the Kansas River immediately prior to the Kansas River flood'.
 
 
 47
 In view of the allegations of the complaints we hold that the activity of the government employees on which the actions are based were misrepresentations within the meaning of section 2680(h). To misrepresent means 'to give a false, improper or imperfect representation' and that is the charge against the government employees here.
 
 
 48
 Appellants' argument that Section 2680(h) applies only to wilful misrepresentations and does not apply to the claims of negligent misrepresentation which are here asserted has been fully considered but we do not sustain it. We are in accord with the holdings of the Second Circuit in Jones v. United States, 1953, 207 F.2d 563, 564. It appeared in that case that Jones was a major stockholder in a corporation which had leased certain oil lands from the United States. In response to Jones' request as to the oil potential of the leased lands, the Department of the Interior, in charge of supervising operations on the leased lands, misrepresented the oil potential by underestimating the oil value of the land by 300%. Relying on that representation, Jones sold his stock for one-third its actual value. Suit was then filed under the Tort Claims Act for the difference between the actual sales price and the price at which the stock would have been sold had the United States not misrepresented the potential oil recovery. The stockholder's complaint charged, first, a negligent misrepresentation and, secondly, a wilful misrepresentation as to the oil value. The Court of Appeals for the Second Circuit, ruling that "misrepresentation' must have been meant to include negligent misrepresentation', unanimously affirmed the district court's dismissal of the Jones complaint and stated:
 
 
 49
 'Plaintiffs' second cause of action asserts wilful misrepresentation. This claim is clearly barred by Sec. 2680(h) of the Act. See United States v. Silverton, 1 Cir., 200 F.2d 824, at page. 826. We think the first cause of action, for negligence, is also barred. Section 2680(h) prohibits suits against the government on claims arising out of 'assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.' As 'deceit' means fraudulent misrepresentation, 'misrepresentation' must have been meant to include negligent misrepresentation, since otherwise the word 'misrepresentation' would be duplicative. The construction is strengthened by the inclusion of libel which may be either negligent or intentional.'
 
 
 50
 Insofar as the instant claims are based on negligence in failing to inform or warn the plaintiffs that the flood was coming, we think that conduct also is within the exception of section 2680(h). That charge is in substance that the duty rested upon the employees to state or represent the imminence of the flood and that the negligent failure to make any statement had the same effect upon the plaintiffs as the alleged misinformation negligently given. The purpose of excepting federal liability on account of negligent misrepresentation necessarily extends to negligent failure to represent which has the same effect as an affirmative misrepresentation. The intent of the section is to except from the Act cases where mere 'talk' or failure to 'talk' on the part of a government employee is asserted as the proximate cause of damage sought to be recovered from the United States.
 
 
 51
 5. The government's contention that Section 2680(a) bars the claims.
 
 
 52
 The section excepts from the coverage of the Act:
 
 
 53
 'Any claim based upon an act or omission of an employee of the Government, using due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'
 
 
 54
 On this point the government's contention is that the instant claims are excepted from coverage of the Act because they are based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, and that the activities on which the claims are based are governmental in nature within the meaning of the Act.
 
 
 55
 The specific activities of flood and river forecasting here involved are authorized by the Act of June 28, 1938, 52 Stat. 1226, 33 U.S.C.A. § 706,[4] which authorizes the Weather Bureau to establish and maintain.
 
 
 56
 'a current information service on precipitation, flood forecasts, and flood warnings, whenever in the opinion of the Chief of Engineers and the Chief of the Weather Bureau such service is advisable in connection with either preliminary examinations and surveys or works of improvement authorized by law for flood-control purposes.'
 
 
 57
 In presenting the government's contention that such functions constitute a service for the public at large for governmental purposes discretionary in nature and entirely dissociated from any private business counterpart, it is pointed out that the 'discretionary function' exception in the Tort Claims Act is closely linked with the declaration of Sec. 2674, supra note 1, that the United States may be held liable only 'in the same manner and to the same extent as a private individual under like circumstances'.
 
 
 58
 When the two sections are read in relation, as they must be, it becomes clear that Congress intended to prohibit imposition of liability upon the United States for activities undertaken by the United States in circumstances that are not like but differ in essential character from those in which any comparable private enterprises are carried on. 'The Act did not create new causes of action where none existed before.' If the activity is purely governmental there can be no liability under the Act which by its terms is conditioned on the liability of a private individual in like circumstances.
 
 
 59
 It is insisted, and we agree, that the information service on flood forecasts which the Weather Bureau is authorized to establish and maintain is a mere incident of the continuing government struggle to control the flooding of the rivers and minimize flood damage. The service is plainly of a governmental nature or function intended for the public at large and wholly for governmental purposes. It is dissociated from any private business counterpart and is closely analogous to the action all governments must take against common enemies, foreign and domestic, or against plagues and epidemics and against conflagrations. As was said by the Supreme Court in the Dalehite case, supra (U.S. 15, 73 S.Ct. 972):
 
 
 60
 'Our analysis of the question is determined by what was said to the Feres case. See 28 U.S.C. §§ 10346 and 2674, 28 U.S.C.A. §§ 1346, 2674. The Act, as was there stated, limited United States liability to 'the same manner and to the same extent as a private individual under like circumstances'. 28 U.S.C. § 2674, 28 U.S.C.A. § 2674. Here, as there, there is no analogous liability; in fact, if anything is doctrinally sanctified in the law of torts it is the immunity of communities and other public bodies for injuries due to fighting fire. This case, then, is much stronger than Feres. We pointed out only one state decision which denied government liability for injuries incident to service to one in the state militia. That cities, by maintaining fire-fighting organizations, assume no liability for personal injuries resulting from their lapses is much more securely entrenched. The Act, since it relates to claims to which there is no analogy in general tort law, did not adopt a different rule. See Steitz v. City of Beacon, 295 N.Y. 51, 64 NE.2d 704, 163 A.L.R. 342. To impose liability for the alleged nonfeasance of the Coast Guard would be like holding the United States liable in tort for failure to impose a quarantine for, let us say, an outbreak of foot-and-mouth disease.'
 
 
 61
 The appellants here have sought to find analogy to their cases in the many instances where it has been held in Missouri and generally that failure to warn of a known danger or negligently giving assurance of safety may become an actionable tort but there is no status or relationship between the government in its fight against floods, pestilence, common enemies or fires which is in any wise analogous to that which existed between the tort feasors and the persons injured in the cases cited and we deem the citations irrelevant.[5]
 
 
 62
 We think that in this case, as in Feres v. United States, supra (340 U.S. 135, 71 S.Ct. 157), 'that plaintiffs can point to no liability of a 'private individual' even remotely analogous to that which they are asserting against the United States.' Nor can the service of the Weather Bureau be distinguished in the aspect here relevant from the flood control service involved in Coats v. United States, 8 Cir., 181 F.2d 816, 19 A.L.R.2d 840. The weather service evolved into a Bureau of the Department of Commerce in 1940, 54 Stat. 1236, § 8, 5 F.R. 2421, 5 U.S.C.A. following section 133t, and now includes hundreds of stations which issue weather and river stage forecasts. But they are vested by the statute with wide latitude of discretion to determine whether 'in (their) opinion such forecasting is advisable.' The forecasting or omission of forecasts by the Bureau is a 'discretionary function' excepted from the Act by Section 2680(a). Dalehite v. United States, supra.
 
 
 63
 Another contention for the United States in support of the judgments appealed from is that 2680(a) applies because the government employees involved are themselves immune from liability.
 
 
 64
 In the In re Texas City Disaster Litigation, 5 Cir., 197 F.2d 771, 776, affirmed sub. nom. Dalehite v. United States, supra, the court pointed out that the Tort Claims Act 'merely subjects the Government to the same liability as the delinquent employee in accordance with the local law.' The government liability derives from the doctrine of respondeat superior and 'where the employee is immune the employer is entitled to a like immunity.' In the situation here presented the governmental acts the employees are required to perform consist in making forecasts from hour to hour and day to day which are expressions of opinion, expectation, and predictions for the future involving exercise of judgment and discretion. The employees are immune from suit for such acts (and cannot be held liable for the nine hundred odd million dollars of damages said to have resulted from the Kaw River flood). That immunity of the employees is additional ground for the application of Section 2680 to except the United States from the coverage of the Tort Clams Act in these cases.
 
 
 65
 It is accordingly held that each of the contentions for the government should be sustained, to-wit: (1) That recovery in the actions is barred by Section 3; (2) that the Tort Claims Act does not repeal said Section 3; (3) that said Act does not accord a right of action upon the facts alleged; (4) that section 2680(h) excepts the claims from the coverage of the Act, and (5) that Section 2680(a) excepts the claims from such coverage.
 
 
 66
 The judgments are affirmed.
 
 
 67
 JOHNSEN, Circuit Judge (concurring separately).
 
 
 68
 To me, there are two fundamental grounds of non-liability here, and I would avoid any possible weakening of their emphasis by the discussion of other contentions.
 
 
 69
 The first is the absolute policy which Congress has expressly declared, that 'No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place'. 33 U.S.C.A. § 702c. This unmistakable and long-established policy can not soundly be regarded. I think, as having been repealed by implication, in the enactment of the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., on the basis of any surrendering indication in either the Act's general language or its legislative history. But this ground is fully covered in the court's opinion, and I shall not discuss it further.
 
 
 70
 The second ground is the equally absolute policy which has always existed in the common law, that the dissemination or nondissemination of public information, not of a personal character, is without any basis of a tort in respect to its accuracy. This has been true where the dissemination is engaged in by a private citizen, such as a newspaper or a radio station, just as much as where it is engaged in by the Government. In both situations, whatever duty of care or of integrity might be argued morally to underlie the gathering or dissemination of such information has been regarded legally as being simply a duty owed to the public at large and not to the individual.[1] And, on historic common-law principle, where no duty is owed to an individual, there is no basis for him to claim a wrong or a tort against him.
 
 
 71
 A duty to the individual, in the gathering or dissemination of such public information as is here involved, as a foundation for the existence of a tort against him, would therefore require a statute creative of it. Missouri has never- as, I am sure, also has no other State- enacted a statute purporting to create a duty or a responsibility to the individual for any inaccuracy on the part of a newspaper or a radio station or any other disseminator to the public of such general information. And, as to the Government, the Federal Tort Claims Act recognizes the existence of a tort and a tort liability on the part of the United States only 'to the same extent as a private individual (would have a liability) under like circumstances,' 28 U.S.C.A. § 2674, or, as jurisdictionally stated in § 1346(b), 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'[2]
 
 
 72
 This second absolute policy of nonliability in tort for any inaccuracy in public information such as is here involved, of itself, then, leaves the present situation without any basis for recovery. To repeat what I have said, no liability would have existed against a newspaper or a radio station for any inaccuracy, negligent or otherwise, in whatever public information it might, on its own accord and by its own means, have undertaken to gather and disseminate about the flood conditions of the Kansas River, and there is accordingly no basis for any possible contention that the Federal Tort Claims Act has opened the door to any such liability against the United States.
 
 
 73
 I would hope that the emphasis made here of the absolute policy of nonliability in the gathering or dissemination of public information might serve to discourage any further attempts on the part of the bar to get the camel's nose into the tent in this general field. I confess that it is a little disturbing to me that it even should have been thought, as has been done in this case and in Jones v. United States, 2 Cir., 207 F.2d 563,[3] that the individual citizen in a free state ought to have paternalistic protection from his Government against the need to exercise his own judgment on the things he may be told or not told by it, as a matter of purported information, and against his right to believe or disbelieve all or any of this as he may see fit.
 
 
 74
 The philosophy of liability that is here involved would imply that we have gone so far down the road of paternalism that, equally as in the present situation, the courts should regard the Government as having an obligation, for example, to pay a flour miller for the loss sustained by him in relying upon an erroneous agriculture-department report of wheat-crop shortage and having purchased wheat on that basis to take care of his milling needs; or to pay a plumber for his loss from having stocked up on a supply of unmovable bath tubs in reliance upon an erroneous commerce-department census as to the number of homes in his community that are without this facility; or to pay a laborer for his expense and loss of wages in having given up his job and migrated to California in reliance upon some erroneous labor-department statistics as to the amount of work there available in his field or skill.
 
 
 75
 These examples could be endlessly compounded, and the amount of liability that they would involve might be infinite. Any such concept of the Federal Tort Claims Act, I reject fundamentally and broadsides. The Federal Tort Claims Act must not be read or given reach as general socialistic legislation, but it must be viewed, for what it is on its face and in its provisions, as a legally just requirement, within our traditional concept and measure of justice, and not on the theory of granted social benefits, that the Government, in its vast penetration into the paths and activities of every-day life, should bear the same responsibility to the individual in the things it thus does as has everyone else to him under similar circumstances.
 
 
 76
 SANBORN, Circuit Judge.
 
 
 77
 I am in complete accord with the views expressed by Judge JOHNSEN in his concurring opinion.
 
 
 
 [1]
 Section 2674 of the Act provides:
 'The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.'
 
 
 [2]
 'Sec. 3
 'No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: Provided, however, That if in carrying out the purposes of this Act it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of War and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands.'
 
 
 [3]
 The government's brief presents without contradiction that:
 'In time of national disaster, it has always been the custom of Congress to extend assistance on an emergency relief basis. This general congressional policy is reiterated in the Disaster Relief Act of September 30, 1950, 64 Stat. 1109, which authorizes federal agencies to provide food, clothing, temporary shelter, and other critical needs to victims of flood, hurricane, drought, earthquake, or other major disaster. 96 Cong.Rec. 11898. It excludes federal assumption of any responsibility of 'payment for damages' resulting from the disaster. 96 Cong.Rec. 11905.
 'It is especially significant that in 1951- five years after passage of the Federal Tort Claims Act on which the instant suits are based- this federal policy of extending emergency relief aid but prohibiting indemnification for property damage was reexamined and explicitly reaffirmed by Congress with specific reference to the damages caused by the July 1951 Kansas River flood.
 'On July 18, 1951, within five days after the flood waters inundated the Kansas Cities, Congress appropriated $25,000,000 for 'disaster relief' in the affected area. 65 Stat. 123. And, in strict conformity with the settled policy of emergency relief but no indemnification, the appropriation was earmarked 'to be used strictly for relief' in 'accordance with Public Law 875 (the Disaster Relief Act of 1950)', 97 Cong.Rec. 8177. Thus the funds were made available not for property damage indemnification but for shelter, clothing, medical supplies, and other exclusively emergency needs. 97 Cong.Rec. 8178.
 'The history of other legislation in the period immediately following the flood shows even more conclusively congressional opposition to the indemnification sought in the instant suits. On August 1, 1951, less than 20 days after occurrence of the damages here complained of, H.R. 5022 was introduced by Representative Bolling. 97 Cong.Rec. 9359. This bill, acknowledged by its sponsor as being completely unprecedented, would have required federal indemnification of the damages caused by the flood. Upon referral to the Committee on the Judiciary, the bill was considered by Subcommittee Number 3, which has 'special jurisdiction' over bills asserting claims against the United States. Legislative Calendar, House Committee on Judiciary, 82d Cong., p. 3, 160. The Subcommittee held hearings and adversely reported the bill to the full Committee, which tabled it. Id. at p. 160. While there is no printed record of the hearings, the Subcommittee's files show that the Secretary of Army reporting on the novel indemnification proposal, declared that the
 'Federal Government has never assumed responsibility for damage to private property resulting from flood damages.'
 Similarly, the Secretary of the Interior pointed out to the Committee that the 'portion of the bill which provides for indemnification for flood losses sustained opens up, I believe, a completely new field. Your Committee will want to consider the full ramifications of a proposal which might in effect establish a Federal responsibility for losses (sustained in national disasters).'
 Likewise abortive were other contemporaneous attempts in Congress to subject the Government to liability for the Kansas River flood damage. Legislative hearings, debates, reports, and action taken show strong insistence by Congress in adhering to the basic policy set forth in the 1950 Disaster Relief Act- emergency assistance only and no indemnification for property loss. Thus, H.J.Res. 341, 82d Cong., 1st Sess., later enacted as the Flood Rehabilitation Act of October 24, 1951, 65 Stat. 615, would, as originally introduced, have appropriated moneys not only for relief but, like H.R. 5022, for indemnification purposes. The basic objection to 'getting into a field of paying based on loss or indemnification' rather than on relief or emergency need was expressed early in the hearings with the admonition that 'there are certain basic things if Government is to last that we have to think of. One of them is that a legislative body just cannot issue from the Public Treasury at its whim. Hearings Before a Subcommittee of the House Committee on Appropriations, 82d Cong., 1st Sess., on Rehabilitation of Flood Stricken Areas, p. 87.'
 On October 3, 1951, the House Committee on Appropriations, while authorizing disaster relief and loan appropriations, flatly rejected the indemnification feature of H.J.Res. 341:
 '* * * The Committee heard considerable testimony on this recommendation, and after careful deliberation has not approved it for several important reasons.
 'Congress has never appropriated funds for indemnities such as have been proposed here in any previous disaster of this kind, and no legislation has ever been enacted by Congress authorizing such appropriations. This would be a major departure from the present concept of Government and, therefore, must be given more extensive study than is now possible under emergency conditions that demand prompt action on the part of Congress. The Committee believes that the approval of the proposed indemnification program would commit the Federal Government to a new concept of Federal responsibility which would result in an almost unlimited number of claims from victims of every 'Act of God' disaster throughout the country regardless of the type or size of the disaster. The financial implications inherent in such an action would be enormous. H.Rept. 1092 on H.J.Res. 341, 82d Cong., 1st Sess., p. 5.'
 This same need for adhering to the established policy of non-indemnification for property damage loss sustained in the flood was reiterated in the congressional debates on H.J.Res. 341. Congressman Norrell, Chairman of the Appropriations Committee in charge of the legislation, stated:
 'I want to touch on the indemnity program for a minute. We did not go along with that. It was not authorized. It is a new policy which, Mr. Chairman, could involve a sum of money in the future that is so staggering that the mortal mind cannot comprehend it. 97 Cong.Rec. 12637.
 'And Congressman Furcolo, a member of the same Appropriations Committee, warned that 'we must be very careful not to establish a precedent that will return to haunt the Congress or bankrupt the Treasury.' 97 Cong.Rec. 12641.
 'In further debate on H.J.Res. 341, Congressman Bolling brought the issue of Federal responsibility for the flood damage into even sharper focus. Stating that he 'disagreed flatly' with the majority view opposing indemnification, Congressman Bolling offered an amendment on the floor of the House of Representatives, which incorporated the same indemnity provisions stricken from H.J.Res. 341 by the Appropriations Committee before being reported out to the House and which had also appeared in his earlier bill, H.R. 5022. 97 Cong.Rec. 12642, 12644. The House, ratifying the Committee's rejection of the indemnity provisions, defeated the amendment. 97 Cong.Rec. 12646.
 'A similar amendment offered by Congressman Scrivner on the floor was also defeated. 97 Cong.Rec. 12647-8. Congressman Scrivner's futile argument in favor of indemnification is of special importance here. It shows full congressional awareness that the indemnification proposal was based, just as the claims for indemnification now before this Court are based, on the asserted liability of the United States for failure to issue adequate flood forecasts or river stage predictions. Thus, Congressman Scrivner, urging Congress to impose responsibility for the damage caused by the 1951 Kansas River flood, contended that there had not 'been adequate warning' of the impending flood. 97 Cong.Rec. 12639,
 'After defeat of both the Bolling and Scrivner amendments, H.J.Res. 341 was passed by the House in the same form in which it had been reported by the Committee, i.e., without any provision for indemnification of property damage. 97 Cong.Rec. 12636, 12650. And it passed the Senate in that same form after the Senate's rejection of an indemnification amendment offered by Senator Hennings, who had authored S. 1935, the companion measure to Representative Bolling's H.R. 5022. 97 Cong.Rec. 13331, 13340. The Resolution, limited to the Rehabilitation, relief and loan provision, with the indemnity features deliberately excluded, was approved and enacted as the Flood Rehabilitation Act on October 24, 1951, 65 Stat. 615, 616.
 'We submit that this legislative history plainly shows (1) that Congress had under consideration the claims now asserted before this Court, (2) that Congress was made fully cognizant of the particular theory on which these flood claims arising out of the 1951 flood were based, i.e., the inadequate flood prediction theory, (3) that Congress, after careful consideration of the claims in hearings and in extensive debate, deliberately chose to adhere to its traditional policy of not allowing indemnification for flood damage, and (4) that Congress for that reason expressly declared its refusal to impose upon the United States any responsibility to pay for the flood damage sustained in the 1951 flood.'
 
 
 [4]
 'Sec. 8. That there is hereby authorized an expenditure of not to exceed $375,000 per annum, from any appropriations heretofore or hereafter made for flood control by the United States, for the establishment, operation, and maintenance by the Weather Bureau of a current information service on precipitation, flood forecasts, and flood warnings, whenever in the opinion of the Chief of Engineers and the Chief of the Weather Bureau such service is advisable in connection with either preliminary examinations and surveys or works of improvement authorized by the law for flood-control purposes, and the Secretary of War upon the recommendation of the Chief of Engineers is authorized to allot the Weather Bureau funds for said expenditure.'
 
 
 [5]
 Including the following: Berry v. Emery, Bird, Thayer Dry Goods Co., 357 Mo. 808, 211 S.W.2d 35; Stumpf v. Panhandle Eastern Pipeline Co., 354 Mo. 208, 189 S.W.2d 223; Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482; Ellington v. Chicago, R.I. & P.R. Co., Mo.App., 45 S.W.2d 105; Bachman v. Quincy, O. & K.C.R. Co., 310 Mo. 48, 274 S.W. 764; Brash v. City of St. Louis, 161 Mo. 433, 437, 61 S.W. 808; Ford v. Wabash R. Co., 318 Mo. 723, 300 S.W. 769
 
 
 [1]
 We are of course not here concerned with any contract liability which a disseminator of such information might perhaps incur to an individual as a matter of gathering and supplying the information to him as a private service, for personal purposes, under a special agreement
 
 
 [2]
 Even some of the liabilities which might exist against a private person have been made the subject of specific exception as to the United States, under 28 U.S.C.A. 2680
 
 
 [3]
 In that case, the United States was sought to be held liable for the giving of incorrect public, oil-reserves, information to the plaintiff by the U.S. Geological Survey. The court, instead of holding broadly, as I have suggested here, that no liability exists at all against the Government for inaccuracy in the furnishing of such public information, held that there was no liability, because liability for fraudulent or negligent misrepresentation was specifically excepted from the Federal Tort Claims Act, under 28 U.S.C.A. § 2680(h). To me, it is unnecessary to scan the special exceptions from the coverage made by the Act, for the reason that liability for inaccuracy in the gathering or dissemination of such public information has never been within the coverage of the Act, so that it is unnecessary to remove it on the basis of any exception