760 F.2d 590
 Charlotte JAMES, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
Kathy BUTLER, Individually and as Surviving Wife and Heir of
Eddy Butler, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
Susan B. CLARDY, Individually and as Natural Tutrix of the
Minors, Bridget Marie Clardy and Kenneth Clardy,
Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 Nos. 83-2276, 83-4522.
 United States Court of Appeals,
Fifth Circuit.
 May 16, 1985.
 
 Sharp, Ward, Ross, McDaniel & Starr, T. John Ward, Richard F. Hightower, Longview, Tex., Old & Old, Mount Pleasant, Tex., for James and Butler.
 Bob Wortham, U.S. Atty., Beaumont, Tex., William J. Cornelius, Jr., Asst. U.S. Atty., Tyler, Tex., for U.S. in No. 83-2276.
 Thomas L. Jones, U.S. Dept. of Justice, Washington, D.C., for U.S. in both cases.
 D'Amico, Curet & Dampf, Sam J. D'Amico, J. Michael McDonald, Baton Rouge, La., for Clardy.
 Joseph S. Cage, Jr., U.S. Atty., Dosite H. Perkins, Jr., Asst. U.S. Atty., Shreveport, La., Rosemary Denson, Torts Branch, Civil Div., Dept. of Justice, Washington, D.C., for U.S. in No. 83-4522.
 Appeal from the United States District Court for the Eastern District of Texas.
 Appeal from the United States District Court for the Western District of Louisiana.
 Before CLARK, Chief Judge, GOLDBERG, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS and HILL, Circuit Judges.*
 REAVLEY, Circuit Judge:
 
 
 1
 These cases present the question whether Section 3 of the Flood Control Act of 1928, 33 U.S.C. Sec. 702c (1982), gives the United States absolute immunity where there would otherwise be liability under the Federal Tort Claims Act, 28 U.S.C. Secs. 2671-80 (1982), for personal injury resulting from government employees' negligent failure to warn of government-created hazards to known recreational users. We hold that the 1928 Act provides no such immunity, because the government's provision for the safety of recreational users of public waters is discrete from the government's control of floodwaters.
 
 I. STATEMENT OF THE CASE
 A. James v. United States
 
 2
 On June 8, 1979, the United States Corps of Engineers was discharging water in great volume through the Millwood Dam in Arkansas. The release of waters created a violent current near the dam. No signs warned of the danger. A cable strung with orange buoys usually delineated the area of danger, but it had broken and drifted away when struck by floating debris. Government personnel knew these warning devices were not in place, but did not attempt to repair them. They took no other steps to warn the public.
 
 
 3
 Charlotte James and Kathy Butler happened to be skiing near the dam. The skiers fell and were pulled by the strong current through the tainter gates; both were injured. Eddy Butler, Kathy's husband, dived into the water to try to save his wife, but was also pulled through the structure. He drowned. The survivors sought relief under the Federal Tort Claims Act.
 
 
 4
 After a bench trial, the district court found that the plaintiffs were not negligent, that government agents had willfully and even maliciously[1] failed to warn of a known danger, and that this failure had been a proximate cause of the plaintiffs' injuries. The judge set the damages at $1,000,000 to Kathy Butler for her injuries and for the wrongful death of her husband, and at $40,000 for Charlotte James's personal injuries. He concluded, however, that section 702c barred plaintiffs' recovery because the injuries resulted from floodwaters related to a flood control project. We reverse, holding that section 702c presents no bar.
 
 B. Clardy v. United States
 
 5
 On May 17, 1980, Kenneth Clardy and his father, Joseph Clardy, were fishing in Bayou Courtableau in Louisiana. The bayou is a United States flood control project designed to take excess floodwaters from the Bayou Courtableau Basin through the protection levee of the West Atchafalaya Basin. When government employees opened the gates of the structure to full capacity, a strong current resulted. Only two faded signs at the entrance of the drainage structure warned of the dangerous current. The boaters could not see the signs until they had already been swept into the current. The Clardys' boat became disabled and drifted into the inlet channel. As it was drawn through the open gates of the spillway, the boat overturned and Kenneth Clardy was thrown into the approach basin. He drowned while being pulled through a 220-foot-long barrel of the drainage structure.
 
 
 6
 The district judge entered summary judgment for the government, holding that any negligence was related to the operation of a flood control project and therefore fell within the immunity of section 702c. We reverse the summary judgment.
 
 
 7
 II. THE IMMUNITY PROVISION AND ITS AMBIGUITIES
 
 
 8
 The starting point in every case involving construction of a statute is the language itself. The applicable provision of the Mississippi Flood Control Act of 1928 reads:
 
 
 9
 No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: Provided, however, That if in carrying out the purposes of ... this title it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of the Army and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands.
 
 
 10
 33 U.S.C. Sec. 702c (1982) (emphasis in original). Without a clearly expressed legislative intention to the contrary, statutory language must usually be considered controlling. Escondido Mutual Water Co. v. La Jolla Band of Mission Indians, --- U.S. ----, ----, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753, 761 (1984). Although we hold the statutory language paramount in this case, we have recourse to the history and purpose of the statute to elucidate what we consider to be latent ambiguities. "Where, as here, resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear."[2] Blum v. Stenson, --- U.S. ----, ----, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891, 900 (1984). Properly viewed, the language of the statute is perfectly consonant with the legislative history, but we think it essential to understand the latter in order to view the statute itself correctly.[3]
 
 
 11
 We do not see the language of the immunity provision as being clear-cut and unambiguous,[4] "however clear the words may appear on 'superficial examination.' "[5] United States v. American Trucking Associations Inc., 310 U.S. 534, 544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345, 1351 (1940) (quoting Helvering v. New York Trust Co., 292 U.S. 455, 465, 54 S.Ct. 806, 809, 78 L.Ed. 1361 (1934)). We do not think, for instance, that it is evident what constitutes a "flood" or "floodwaters."[6] Nor is the word "damage" quite unequivocal.[7] Nor, indeed, is it clear why "at any place" was tacked on to the sentence, inasmuch as the immunity language is already comprehensive without it.[8]
 
 
 12
 Nevertheless, section 702c is understandable and explicable as a statement of the precise issue before Congress: the allocation of costs of the project at hand. The correctness of this explanation of the statutory language is demonstrable on four grounds. First, in the congressional debates "liability" and "damage(s)" were repeatedly used in reference to these costs. Second, the proviso of section 702c--the language immediately following the disclaimer--apportions costs in the event of inundated and overflowed lands due to levees having been impracticable; again, this specific language, inserted by the drafters to clarify the meaning, is concerned with the allocation of costs. Third, the section 702c immunity replaced what in previous versions had been Senate largess; the immunity was a legislative answer on the controversial issue of whether the federal government or other entities would absorb the general costs of the project. And fourth, the legislative history is replete with references to damaged land, strongly suggesting the conclusion that the phrase "at any place" was intended to be read as if it were "to any place," hence the phrase interpreted in full: "damage by floods to any place."
 
 
 13
 If, however, we make section 702c into a disclaimer of liability for consequential damages of a different nature, we create serious contextual or external ambiguities, and risk construing the statute within its letter, but beyond its intent.[9] The statute does not define the nature of the relation between the floodwaters and flood control projects on the one hand, and the activities of the United States on the other. For example, is the government invariably immune from damage attributable to floodwaters? Let us suppose that park personnel negligently divert the course of a stream onto a campground, and subsequently a flood destroys the camp. Would the immunity obtain? Perhaps so, if we ignored all the statutory language other than the one-sentence disclaimer of liability, ignored the legislative history, and ignored the underlying purpose of the statute.[10] Yet precedent stands against immunity. Graci v. United States, 456 F.2d 20 (5th Cir.1971) (claim not barred where plaintiffs have alleged floodwater damage resulting from governmental negligence unconnected with any flood control project); Peterson v. United States, 367 F.2d 271 (9th Cir.1966) (government may be liable for negligence where the project was wholly unrelated to flood control); see Seaboard Coast Line Railroad v. United States, 473 F.2d 714 (5th Cir.1973); Florida East Coast Railway v. United States, 519 F.2d 1184, 1191 (5th Cir.1975).
 
 
 14
 Other ambiguities in application complicate the analysis. For instance, must the water be floodwater, or is it enough that waters at a normal level are managed for flood control purposes? This question arises when government employees negligently release waters impounded from normal flowage. If we equate the impoundment of near-normal waters for flood control purposes with actual floodwaters, we could not uphold the immunity provision if the impounded water amounted to a taking of the covered land.[11] Here again, the provision proves to be less than absolute.
 
 
 15
 A third interpretative problem crops up when the damage is from floodwater at a flood control project, but the floodwater is only a condition that is incidental to the governmental fault. Thus we might have an air traffic controller's negligence causing a plane to crash into a flood control lake. Or a government driver negligently placing a handicapped person where the latter is subsequently unable to escape raging waters. Or a steep boat launch into a flood control reservoir left unmarked, so deceiving a driver that he thinks he is traveling a through road until he plunges into the lake. The bald language of the immunization might suggest no government liability.
 
 
 16
 To handle the problems presented by these ambiguities, it is necessary to understand what it was that Congress wanted to achieve with this language. We recognize, of course, that a statute governs all the circumstances falling within its purview, not just those which prompted its enactment. The problem lies in delimiting that purview, to which purpose we examine both the statutory language and the historical problems at which it was aimed;[12] and from this examination we arrive at the overarching purpose of the legislation. Our duty is " 'to find that interpretation which can most fairly be said to be embedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.' " Commissioner v. Engle, 464 U.S. 206, ----, 104 S.Ct. 597, 604, 78 L.Ed.2d 420, 429 (1984) (quoting NLRB v. Lion Oil Co., 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331, 342 (1957) (Frankfurter, J., concurring in part and dissenting in part)).
 
 III. THE GOVERNMENTAL IMMUNITY IN CONTEXT
 
 17
 When this court seeks to learn congressional intent by examining the legislative history of a statute, "we look to the purpose the original enactment served, the discussion of statutory meaning in committee reports, the effect of amendments--whether accepted or rejected--and the remarks in debate preceding passage." Rogers v. Frito-Lay, Inc., 611 F.2d 1074, 1080 (5th Cir.), cert. denied, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980). The legislative history of the 1928 statute reveals that Congress was concerned with allocating the costs of a major public works program between the federal government and the state and local interests, both public and private, in the wake of a financial, administrative, and engineering debacle. In addition to the construction work itself, these costs or "damages" included acquisition of property rights for levees and diversion channels, where water would flow at normal as well as at flood stages, and the relocation of roads and other facilities.
 
 
 18
 In 1928 flood control was "the greatest question ... before the American Congress." 69 Cong.Rec. 5294 (1928) (statement of Sen. Reed). Nearly a year had passed since the waters of the Mississippi had swollen uncontrollably and violently deluged the Mississippi Valley, with a direct loss of nearly 200 lives and more than $200,000,000 in property damage; 700,000 people were left temporarily homeless. S.Rep. No. 619, 70th Cong., 1st Sess. 12 (1928). Hundreds of pages of the Congressional Record are devoted to one pressing question: what could Congress do to ameliorate the effects of subsequent floods, which would be, of course, inevitable?
 
 
 19
 The inquiry was not a new one; nor indeed was it as controversial as the ancillary issue of who was to pay for this large-scale undertaking. The recurrence of floods in the alluvial valley of the Mississippi had prompted the United States, in conjunction with state and local governments, to build a network of flood control levees, under a project known as the Eads Plan, as far back as 1883. See United States v. Sponenbarger, 308 U.S. 256, 261, 60 S.Ct. 225, 226-27, 84 L.Ed. 230, 235 (1939). The Mississippi River Commission planned and executed the project, following a policy of building "levees only" and of closing every outlet on the river except one. H.R.Rep. No. 1072, 70th Cong., 1st Sess. 5 (1928). Almost a half billion dollars went into the project over a period of more than forty years. Id.
 
 
 20
 Yet the Eads Plan had proved inadequate when the disastrous torrent of 1927 deluged the lower Mississippi Valley. The policy of having constructed only levees was seen as a monumental blunder that had caused great loss of life, and the Mississippi River Commission was discredited. H.R.Rep. No. 1072, 70th Cong., 1st Sess. 7 (1928). One congressman stated in 1928:
 
 
 21
 Many millions of dollars have been spent in an effort to control floods in the Mississippi Valley. Most of the work has been worse than wasted, for it has done much harm instead of good.... We have spent many millions of dollars to build levees; that is, great embankments alongside of and a little distance from the natural banks of the river, and the result has been that every flood has been more disastrous than the floods which preceded it.
 
 
 22
 69 Cong.Rec. 7011 (1928) (statement of Rep. Crosser). Congress moved quickly to establish a new flood control plan of a magnitude never undertaken before. Most of the hundreds of pages devoted to flood control in the 1928 Congressional Record reflect the concern of apportioning costs.
 
 
 23
 The Mississippi River Commission and the Secretary of War both submitted flood control proposals to Congress. The Senate originally endorsed the Jadwin Plan, submitted by the Chief of Engineers for the Secretary of War. This plan would have required the federal government to provide all the rights of way for flood control projects; the estimated cost to the federal government was $296,400,000 over ten years. S.Rep. No. 619, 70th Cong., 1st Sess. 11 (1928). The Jadwin Plan as initially adopted by the Senate was extremely generous:
 
 
 24
 Just compensation shall be paid by the United States for all property used, taken, damaged, or destroyed in carrying out the flood control plan provided for herein, including all property located within the area of the spillways, flood ways, or diversion channels herein provided, and all rights of way thereover, and the flowage rights thereon, and also including all expenditures by persons, corporations, and public service corporations made necessary to adjust or conform their property, or to relocate same because of the spillways, flood ways, or diversion channels herein provided.
 
 
 25
 S. 3740, 70th Cong., 1st Sess. 54, 69 Cong.Rec. 5483 (1928) (emphasis added). The original House version of the Act also authorized the United States to "pay just compensation for all rights of way and damages, including expenses to railroads or others in changing their property." H.R.Rep. No. 1100, 70th Cong., 1st Sess. 12 (1928) (emphasis added). Both the House and Senate versions required that title to the lands be turned over to the states. Id. at 5. In the end, however, this federal beneficence was supplanted by a disclaimer of any liability for "damage ... at any place." 33 U.S.C. Sec. 702c. The key to the immunity clause of section 702c lies in the debates over the extent to which the United States should bear these costs.
 
 
 26
 The legislation was intermittently debated in Congress from February 1928 until May 15, 1928, when the final bill was enacted. As late as April 23, Congressman La Guardia told his colleagues in the House of Representatives, "There is no one who contends that property that is damaged by the work of the Government should not be paid for." 69 Cong.Rec. 7002 (1928). In that same discussion, Congressman Cox inquired of Congressman Frear whether "he favor[ed] the taking or damaging of private property for public use without just compensation," to which Congressman Frear replied, "I believe if this land is damaged beyond what it has been under the original overflowing of these flood ways, the Government should pay for that damage." Id. at 7000.
 
 
 27
 On the same day, the language that now begins section 702c was first proposed by Congressman Reid, Chairman of the House Flood Control Committee. See 69 Cong.Rec. 7022, 7028 (1928). Little was said of it directly, aside from the acknowledgment of its seeming redundancy, in the light of the existing sovereign immunity: "While it is wise to insert that provision in the bill, it is not necessary, because the Supreme Court of the United States has decided, as you have heard reiterated many times during the discussion of this bill, that the Government is not liable for any of these damages."[13] 69 Cong.Rec. 7028 (1928) (statement of Rep. Spearing). The question of course arises, if the immunity clause was unnecessary, then why might it have been wise? It may have been wise--at least the framers considered it so--inasmuch as it declared in advance what part of the expenses of this project the United States was to pay. That was to be what items Congress specified and nothing more.
 
 
 28
 Those who prepared the amendment were careful to clothe it with every possible provision to make the city of New Orleans legally liable to third persons; that is, persons other than the Federal Government.... [T]hey enlarged the [local] obligation so as to include all damage claims arising out of the construction of the spillway, not merely those against the Government or for which the Government might be liable.
 
 Id.[14]
 
 29
 More important, however, the disclaimer of liability must be read as a direct negation or repudiation of the provision it superseded, which would have provided munificence to those whose property was affected. The earlier provision, it must be remembered, would have authorized the United States to "pay just compensation for all rights of way and damages, including to railroads or states in changing their property." H.R.Rep. No. 1100, 70th Cong., 1st Sess. 12 (1928). This version had been attacked on April 18 as "contain[ing] vicious provisions," 69 Cong.Rec. 6712 (1928) (statement of Rep. Kopp), because it might subject the government to prodigious liabilities. Congressman Kopp suggested that the provision had "originated in some railroad office," because it "[gave] the railroads in the Mississippi Valley an unfair and unjust advantage." Id. With these mounting criticisms, and a President who had adopted a less munificent approach for the federal government,[15] the provision was changed to read as it now does. Legislative language is often placed in statutes for the sake of legislators (to obtain their votes, perhaps) as well as for courts; this seems clearly to be such an instance.
 
 
 30
 Congress decided that, with the narrow exceptions stated in the Act (construction costs, rights of way, and constitutional takings), the United States Government was not to pay the cost for floodwater inundation or damage. It seems likely that the disclaimer of immunity was directed solely at flooding; Congress shifted most of the risks and costs connected with flooding onto local entities and private owners, or both. It seems doubtful that Congress intended to shield the negligent or wrongful acts of government employees--either in the construction or in the continued operation of the Mississippi plan.[16]IV. HISTORICAL INTERPRETATION OF THE SCOPE OF THE PROVISION
 
 A. Broad-brush Interpretations
 
 31
 In interpreting the immunity provision, most courts have cited only the general disclaimer stating that no liability shall attach for any flood damage at any place.[17] By reviewing only this portion of section 702c, the courts have construed it to grant immunity in the "broadest and most emphatic language."[18]
 
 
 32
 In National Mfg. Co. v. United States, 210 F.2d 263, 271 (8th Cir.), cert. denied, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108 (1954), the first case to deal extensively with section 702c, the court interpreted the language to provide absolute immunity to the government for any negligence related to floods or flooding. In that case, owners of property along the Kansas River sued the United States for failing to warn of a flood that damaged their property. The Eighth Circuit stated:
 
 
 33
 Section [702c] plainly bars recovery against the United States. The section does not limit the bar against such recovery to cases where floods or flood waters are the sole cause of damages. It does bar liability of any kind from damages "by" floods or flood waters but it goes further and in addition it bars liability for damages that result (even directly) "from" floods. The use of the word "from" in addition to "by" makes it clear that the bar against federal liability for damages is made to apply wherever floods or flood waters have been substantial and material factors in destroying or damaging property. The language used shows Congressional anticipation that it will be claimed after the happening of floods that negligence of government employees was a proximate cause of damages where floods or floodwaters have destroyed or damaged goods. But the section prohibits government liability of "any kind" and at "any place." So that uniformly and throughout the country at any place where there is damage "from" or "by" a flood or flood waters in spite of and notwithstanding federal flood control works no liability of any kind may attach to or rest upon the United States therefor.
 
 
 34
 Id. at 271. The complaint in that case was not directed at government employees engaged in flood control construction, but was confined to flood forecasters. Id. at 275. The court in part justified the result on grounds of public policy rather than on a legislative grant of immunity. Id. at 274. Nonetheless, National Mfg. absolved the United States of all liability from any damage resulting from floods on the basis of section 702c.
 
 
 35
 Three circuits have adhered closely to the expansive reading of section 702c in National Mfg. In Callaway v. United States, 568 F.2d 684, 687 (10th Cir.1978), the Tenth Circuit stated: "We can conceive of no set of facts appellants could prove in support of their claims for which recovery would not be barred by 33 U.S.C. Sec. 702c." The substance of National Mfg. has been followed only by the Eighth Circuit,[19] the Tenth Circuit (in Callaway), and the Second Circuit[20] without some judicial attrition of the immunity's absoluteness.
 
 
 36
 Our legislative analysis does not bear out the construction that National Mfg. gave the immunity provision. Perhaps " 'the immunity from liability for floodwater damage arising in connection with flood control works was the condition upon which the government decided to enter into the area of ... flood control programs.' "[21] But "it is simply impossible 'to accept this immunity provision, reasonably related to government involvement in flood control programs, as an absolute insulation from liability for all wrongful acts in other situations.' "[22]
 
 
 37
 The apparent illegitimacy of the broad-brush interpretation is heightened by an examination of the 1936 National Flood Control Act, 33 U.S.C. Secs. 701a-701u (1982). Eight years after the Mississippi Flood Control Act, Congress addressed the issue for nationwide coverage. Yet Congress did not repeat or re-enact[23] section 702c, or say anything about consequential damages. As in 1928, Congress was much concerned with the allocation of costs, and the specific disclaimer of liability in the act reflects this concern. In 1946, Congress again contemplated at length sovereign immunity when the Federal Tort Claims Act, 28 U.S.C. Secs. 2671-80 (1982), was enacted, but it made no exception for flood control or floodwaters.
 
 
 38
 We are aware, of course, that " 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' " Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 117, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766, 778 (1980) (quoting United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334, 340 (1960)). Yet "[w]hile arguments predicated upon subsequent congressional actions must be weighed with extreme care, they should not be rejected out of hand as a source that a court may consider in the search for legislative intent." Andrus v. Shell Oil Co., 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 1938 n. 8., 64 L.Ed.2d 593, 601 n. 8 (1980).
 
 
 39
 In GTE Sylvania, the Court observed that "subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to enactment." 447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n. 13, 64 L.Ed.2d at 778 n. 13. We are not, however, overriding the legislative history of the 1928 Act with that of the 1936 Act; rather, we are reinforcing that intent. If we override anything, it is but a judicial misconstruction compounded through the years. Our "first duty in construing the statute is to effectuate the express intent of the Congress." Adams v. Morton, 581 F.2d 1314, 1320 (9th Cir.1978), cert. denied, 440 U.S. 958, 99 S.Ct. 1498, 59 L.Ed.2d 771 (1979). The notion that section 702c shielded the United States Government from all liability so that floods could be controlled is an idea Congress never sanctioned. It was the creation of the courts, beginning in 1954.
 
 B. Limitations on the Immunity
 
 40
 Some courts have wisely retreated from the absolutist stance, recognizing that "[r]esort to the policy of a law may be had to ameliorate its seeming harshness or to qualify its apparent absolutes."[24] Markham v. Cabell, 326 U.S. 404, 409, 66 S.Ct. 193, 195, 90 L.Ed. 165, 168 (1945). This court, for example, has declined to construe section 702c as a wholesale immunity provision. If the flooding is unconnected with flood control projects, the United States may be subject to liability. Graci v. United States, 456 F.2d 20, 27 (5th Cir.1971). Hence, where the government's construction of a navigation project diverted floodwater to plaintiff's property, its actions did not come within the grant of immunity under section 702c. Id. Similarly, the Ninth Circuit has held that section 702c does not bar liability when the governmental action was wholly unrelated to any act of Congress authorizing expenditures of federal funds for flood control. See Peterson v. United States, 367 F.2d 271, 276 (9th Cir.1966) (no immunity for dynamiting ice jam which resulted in flooding of properties downstream).[25]
 
 
 41
 The Fourth Circuit, rightly we believe, restricted the immunity more closely to the limited purpose of the statute: to management of the water only if the purpose of flood control is thereby served. Hayes v. United States, 585 F.2d 701 (4th Cir.1978). Under this rationale, section 702c shields the government from liability only for damage due to the floodwaters or to fault in the management of floodwaters, either in the planning or in the execution of the flood control project, and only when flood control purposes underlie the conduct faulted.
 
 C. Recreational Use and the Duty to Warn
 
 42
 We are persuaded that the limitations on the immunity should be elaborated more particularly. The government is not liable for any fault of its employees in controlling floodgates or managing lands to contain, prevent, or manage floods or floodwaters. This immunity, however, does not extend to the fault of government employees in failing to warn the public of the existence of hazards to their accepted use of government-impounded water, or nearby land. Because of section 702c, the government's acts to store, divert, and release waters to further flood control are subject to no risk of liability. If, however, the government allows people to come upon those waters or nearby shores for purposes of recreation, section 702c grants no immunity for government fault in creating a danger or in failing to warn of danger to the public. If a producing cause of the damage or injury is a government employee's negligence in omissions or commissions that diverge from acts strictly for the purpose of controlling floods or floodwaters, and the presence or movement of water for flood control purposes merely furnishes a condition of the accident, there is no section 702c immunity.
 
 V. THE CASES ON APPEAL
 A. Appellants Butler and James
 
 43
 The Millwood Reservoir was dedicated in 1966, and since that time has served a variety of purposes, both recreational and flood control related. It is owned by the United States and operated by the Army Corps of Engineers. The United States Government Printing Office has printed brochures touting the recreational attractiveness of the Millwood Reservoir. The government, through these brochures, encourages its citizens to fish and hunt, to water-ski, and to sightsee at this project.
 
 
 44
 The trial court found that, on the day of the accident, water was being discharged at the Millwood Dam at the rate of 24,000 cubic feet per second. The Army Corps of Engineers was discharging water impounded for flood control purposes. The court below found that the five red-and-white warning buoys normally in front of the dam structure were not in their proper places. A second string of orange buoys had also been displaced. Thus recreational users of the reservoir had no warning of the precipitate discharge.
 
 
 45
 The court further found that the government had actual knowledge that these warning buoys were missing, and that boaters and skiers might be injured, but nonetheless failed to take corrective measures. Judge Parker concluded that "[t]he facts of this case constitute a classic example of death and injuries resulting from conscious governmental indifference to the safety of the public. This case goes beyond gross negligence." We believe it would be as irrational as it would be unnecessary to hold that such conduct falls within what Congress intended to protect by the enactment of section 702c.[26]
 
 B. Appellant Clardy
 
 46
 The court below dismissed this case by summary judgment, on the ground that the water discharge that created the dangerous current was for the purpose of flood control. The conceded fact that the waters released had been impounded for flood control purposes was thought to dispose of the case. On remand, Clardy will be able to develop facts with regard to use of the bayou, adequacy of any warnings, and any other government negligence.
 
 VI. CONCLUSION
 
 47
 We have concluded that the governmental immunity provided by 33 U.S.C. Sec. 702c (1982) does not extend to the fault of government employees who fail to warn the public of the existence of hazards to the accepted use of governmentally impounded water. Hence the plaintiffs in these cases are not barred from bringing suit. We REVERSE judgment in James v. United States, No. 83-2276, and REMAND for entry of judgment consistent with this opinion. We REVERSE the summary judgment in Clardy v. United States, No. 83-4522, and REMAND for further proceedings.
 
 
 48
 GEE, Circuit Judge, with whom GARWOOD, E. GRADY JOLLY, W. EUGENE DAVIS and ROBERT MADDEN HILL, Circuit Judges, join, dissenting:
 
 
 49
 The majority opinion seeks to make a case for the proposition that in enacting Sec. 702c the Congress did not mean what until today every court that has considered its language has concluded it meant to say. It said:
 
 
 50
 No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: .... 33 U.S.C. 702(c) (emphasis added).
 
 
 51
 The majority finds ambiguity, ambiguity which it candidly characterizes as "latent" (at 594), in these words. The occasion for doing so is an appealing one: innocent citizens have been damaged in their lives, bodies and prospects by reason of thoughtless, perhaps callous, conduct by government employees.
 
 
 52
 Looking at the statute, I have sought to devise a form of words that would more plainly rule out liability than does the Congressional language, hopeful that a comparison of what Congress said with what it might have said would reveal some distinction that would permit me to join the Court. I give it, with my additions in brackets:
 
 
 53
 No liability of any kind [whatsoever, either to person, realty or intangible property,] shall attach to or rest upon the United States for any [consequential] damage [or injury whatever, however occasioned,] from or by [, in whole or in part, or in any manner connected with,] floods or flood waters [, whether stored or running free,] at any place ....
 
 
 54
 Having done so, I find that what appears in brackets serves small purpose beyond making the enactment read like an insurance company's form general release rather than a statute. Such releases are designed to be "court-proof." I doubt, however, that even such a redundant form of words as I have imagined would be proof against the approach of the majority, which finds ambiguity even in such terms as "damage" and "flood waters" and visits liability upon the United States for damage resulting, in each of today's cases, from negligence plainly associated with a flood control activity--the release of stored floodwaters. Its holding is thus in the teeth of the statute's plain words and, insofar as I can understand the holding, simply brushes them aside and substitutes for them the court's notions of good policy.
 
 
 55
 I am not, however, sure what it is that the court holds today, although the effect in the cases is tolerably clear. The court's summation of its decision appears at (at 603):
 
 Recreational Use and the Duty to Warn
 
 56
 We are persuaded that the limitations on the immunity should be elaborated more particularly. The government is not liable for any fault of its employees in controlling floodgates or managing lands to contain, prevent, or manage floods or floodwaters. This immunity, however, does not extend to the fault of government employees in failing to warn the public of the existence of hazards to their accepted use of government-impounded water, or nearby land. Because of section 702c, the government's acts to store, divert, and release waters to further flood control are subject to no risk of liability. If, however, the government allows people to come upon those waters or nearby shores for purposes of recreation, section 702c grants no immunity for government fault in creating a danger or in failing to warn of danger to the public. If a producing cause of the damage or injury is a government employee's negligence in omissions or commissions that diverge from acts strictly for the purpose of controlling floods or floodwaters, and the presence or movement of water for flood control purposes merely furnishes a condition of the accident, there is no section 702c immunity.
 
 
 57
 The quoted passage seems to me a classic exercise in granting with one hand and taking away with the other. Midway through its holding, the court intones that "Because of section 702c, the government's acts to store, divert, and release [as it was doing in these cases] waters to further flood control are subject to no risk of liability (emphasis added)." Since that was what the government was unquestionably doing here, these appeals fail and the appellants take nothing--right?
 
 
 58
 Wrong: "If, however, the government allows people to come upon those waters or nearby shores for purposes of recreation, section 702c grants no immunity for government fault in creating a danger or failing to warn of danger to the public." (emphasis added). Taking these passages together, and attempting to construe them together as carefully and charitably as I can, I make the court's meaning in them to be:
 
 
 59
 The government is immune from liability in storing, diverting and releasing flood waters unless in doing so it (purposely? negligently?) creates a danger or fails to warn of one and some member of the public is injured by that danger.[1]
 
 
 60
 In other words, the government is immune from liability until it injures someone and hence needs immunity; when it does so, it has none. Unless this is what the court means, then I do not know what it means; and if this is what it means, then the government has no more immunity in our circuit from damage to persons by floodwaters than has a private citizen for any other tort. All that is required for its liability is negligence (perhaps) on its part in a flood-control operation, causing injury to a member of the public. As to personal injury, and doubtless as to property damage as well,[2] the court has simply repealed 702c--a stunning exercise in judicial power!
 
 
 61
 Having disagreed with what I view as a massive judicial recasting of Congressional intent, I feel obliged to offer a different view of it. Both the language of Sec. 702c and the legislative history[3] seem to me entirely consistent with a purpose in the Congress, poised over a half-century ago on the brink of entry into a massive public works program--one of then unprecedented scope and laden with foreseeable and unforeseeable prospects of liability--to state clearly that the federal treasury was to be placed at risk by it no further than was required by the Constitution.[4] This it did, as in my view the Eighth Circuit correctly observed, in the "broadest and most emphatic language." National Manufacturing Co. v. United States, 210 F.2d 263, 270, cert. denied, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108 (1954). Until today, as the majority correctly points out, at 600- et seq., our circuit and every other that has considered Sec. 702c has taken a similar view of the effect of its language. That unanimous construction has stood for three decades without any sign of Congressional dissatisfaction.
 
 
 62
 Today a different rabbit comes out of the hat, and with a stroke of the pen we impose on the United States precisely the "thousands of lawsuits for damages"[5] that the Congress so plainly refused, in statutory language that is as broad as it is long and, to me, very clear indeed. Because, despite my regard for the majority and its views, this is just the kind of tinkering with statutes that I think judges should not do, I record my respectful dissent.
 
 
 63
 PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:
 
 
 64
 The majority opinion finds ambiguity in the language of 33 U.S.C. Sec. 702c. It then turns to the statute's legislative background in an attempt to learn the immunity clause's true scope. That the effort was exhaustive and so ably done only makes me more sure that there was no clear and universally accepted meaning placed on the indemnity clause by the 1928 Congress.
 
 
 65
 At its best the legislative history does not disprove the purposes found by my brothers in dissent from the face of the statutory language; but unless that reading is the only permissible reading, as they are persuaded, it does not end the matter. It does not because uncertainty that the 1928 Congress intended to exclude all future liability for government negligence related to flood control projects supports the argument that the Federal Tort Claims Act most directly expresses Congress's intent in this field, and that suits for flood-related negligence should be judged only under the FTCA.[1] Yet, while I see more ambiguity than do my dissenting brothers, it is of no matter because we do not write on a clean slate. Without clear evidence of what Congress meant to do in 1928, I would defer to the longstanding and unanimous construction placed on Sec. 702c by this and other courts--a construction which has given specific and unambiguous content to the clause. The majority has not made the case for turning about at this date, regardless of any ambiguity of Sec. 702c as an original proposition. The task of changing such a settled construction should now be left to Congress. See Flood v. Kuhn, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972).[2]
 
 
 
 *
 Judge Goldberg, now a senior judge of this circuit, is participating as a member of the panel initially deciding the appeal now subject to en banc review. 28 U.S.C. Sec. 46(c) (1982)
 
 
 [1]
 The parties have assumed that a showing of willful or malicious conduct is necessary for appellants to recover. The Federal Tort Claims Act provides for governmental liability "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. Sec. 2674 (1982). The trial court applied the Arkansas Recreational Use Statute, Ark.Stat.Ann. Secs. 50-1101-1107 (1971 & Supp.1983), which imposes on the owner of land used by others only a minimal duty: not to injure such persons by willful or malicious conduct. Ark.Stat.Ann. Sec. 50-1106(a) (1971)
 
 
 [2]
 The Supreme Court earlier refined this plain-meaning rule, which "is 'rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.' The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect." Watt v. Alaska, 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80, 88 (1981) (quoting Boston Sand Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928) (Holmes, J.)) (footnote omitted)
 
 
 [3]
 "The actual words used [in a statute] are important but insufficient. The report of congressional committees may give some clue. Prior drafts of the statute may show where meaning was intentionally changed. Bills presented but not passed may have some bearing. Words spoken in debate may now be looked at." Levi, An Introduction to Legal Reasoning, 15 U.Chi.L.Rev. 501, 520 (1948). In the words of Chief Justice Marshall, "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived." United States v. Fisher, 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304, 313 (1804)
 
 
 [4]
 William Empson has defined "ambiguity" as "any verbal nuance, however slight, which gives room for alternative reactions to the same piece of language." W. Empson, Seven Types of Ambiguity 19 (Penguin ed. 1977)
 
 
 [5]
 Even dissenting voices at the Congressional debates objected to the ambiguities of the bill as passed: "Serious objection to the pending bill is justified because of the uncertainty and ambiguity of its provisions .... The bill is just as uncertain, just as ambiguous, just as all-comprehensive and embracing, as subject to criticism and objection now as it was when it received the approval of this body." 69 Cong.Rec. 8187 (1928) (statement of Sen. King)
 Indeed, the specific language of section 702c was considered ambiguous, inasmuch as "the latter part of the last paragraph of the section [i.e., the proviso] [was inserted] so as to clarify the meaning." 69 Cong.Rec. 8119 (1928).
 
 
 [6]
 "Floodwaters" is not an easy word to define. It could readily be defined as "waters that are out of control." Or it might be more broadly defined as "water at a flood control project." We need not endorse either definition here, inasmuch as we assume that the waters in this case were floodwaters. "Flood" has been defined as water that inundates an area of the surface of the earth where it ordinarily would not be expected. Stover v. United States, 204 F.Supp. 477, 485 (N.D.Cal.1962), aff'd, 332 F.2d 204 (9th Cir.), cert. denied, 379 U.S. 922, 85 S.Ct. 276, 13 L.Ed.2d 335 (1964)
 
 
 [7]
 Does this word imply damage to land as opposed to injury to the person? Although the distinction has never been observed with a great deal of fastidiousness, we note the modern predilection to refer to injury to the person, and damage to property. E.g., P. Keeton & R. Keeton, Law of Torts 136 (2d ed. 1971) ("physical damage to property and physical injury to the person."). No court of appeals has applied Sec. 702c to immunize the government from liability for personal injury or death. See infra note 16
 
 
 [8]
 It may be argued that at any place was intended to modify either damage or floods; hence either damage at any place or floods at any place would be the basic phrase. If the intent was not to be so locative as descriptive of what sustains damage, the true effect of the phrase was to exclude the liability for damage to any place
 
 
 [9]
 "It is a 'familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within the spirit nor within the intention of its makers.' " United Steelworkers v. Weber, 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480, 488 (1979) (quoting Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892))
 
 
 [10]
 "The decisions of [the Supreme] Court have repeatedly warned against the dangers of an approach to statutory construction which confines itself to the bare words of a statute, for 'literalness may strangle meaning.' " Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211, 215 (1962) (citation omitted) (quoting Utah Junk Co. v. Porter, 328 U.S. 39, 44, 66 S.Ct. 889, 892, 90 L.Ed. 1071, 1074 (1946)). Those who work with words must rise above the "tyranny of literalness." United States v. Witkovich, 353 U.S. 194, 199, 77 S.Ct. 779, 782, 1 L.Ed.2d 765, 769 (1957)
 
 
 [11]
 There has never been a question but that damages from governmentally induced floods that result in a taking in derogation of Fifth Amendment rights are compensable. See, e.g., United States v. Kansas City Life Ins. Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917)
 
 
 [12]
 In delimiting the purview of the statute, we have "some scope for adopting a restricted rather than a literal or usual meaning of [the statute's] words where acceptance of that meaning would lead to absurd results .... But it is otherwise where no such consequences would follow and where ... it appears to be consonant with the purposes of the Act." In re Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591, 601 (1978) (quotation marks omitted)
 
 
 [13]
 See supra note 11. Congressman Cox even read to the House of Representatives portions of several cases dealing with sovereign immunity and with constitutional takings, among them Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414 (1903) (damages to lands by flooding as the result of revetments erected by the United States along the banks of the Mississippi River to prevent erosion of the banks from natural causes are consequential and do not constitute a taking of the land flooded within the meaning of the Fifth Amendment); and Northern Transp. Co. v. City of Chicago, 99 U.S. 635, 25 L.Ed. 336 (1978) (no action will lie for damages consequent to the erection of public improvements). 69 Cong.Rec. 7106 (1928) (statement of Rep. Cox)
 The legislative history reveals that Congress was concerned not only with takings, but also with other property damages that would directly or indirectly result from the flood plan. Moreover, with regard to these costs the question was not whether government would compensate for private damages and expenses (although some would intentionally be made to be absorbed by corporations and individuals), but which government would pay: federal or state and local.
 
 
 [14]
 We heed the Supreme Court's admonition that "[o]ral testimony of witnesses and individual Congressmen, unless very precisely directed to the intended meaning of particular words in a statute, can seldom be expected to be as precise as the enacted language itself." Regan v. Wald, --- U.S. ----, ----, 104 S.Ct. 3026, 3036, 82 L.Ed.2d 171, 183 (1984). Our use of language in the debates falls clearly within the Supreme Court's "unless ..." clause, for the language quoted is precisely directed to the intended meaning of particular statutory words
 
 
 [15]
 In a message to Congress, President Coolidge stated that it was "axiomatic that states and other local authorities should supply all land and assume all pecuniary responsibility for damages that may result from the execution of the project." S.Rep. No. 619, 70th Cong., 1st Sess. 11 (1928). One of the most outspoken opponents of federal largess invoked the president's stand in the congressional debates:
 Flood control bills now pending before Congress appear to President Coolidge ideally suited to benefit everybody except the actual flood sufferers whom they were originally intended to protect. Railroad companies, lumber interests, individuals holding shares in these concerns, and especially contractors interested in the constructions involved, seem to the President destined to derive majority benefits from the contemplated measures. All in all, he thinks the situation now in Congress is impossible.
 Large sums, which some of the experts whom President Coolidge has consulted have estimated as high as $1,500,000,000 will be expended under the bill to buy rights of way, channels for the flood way and contingent expenses, including major maintenance costs.
 The letting of contracts for the actual construction would be taken out of the hands of Army engineers, where it has heretofore always rested, to become the jurisdiction of the special commission formed under the provisions of the bill.
 * * *
 He regards such a policy as equivalent to bestowing very definite favors upon certain communities at the expense of the remainder of the country.
 
 
 [69]
 Cong.Rec. 6661 (1928) (statement of Rep. Frear)
 
 
 [16]
 It is even less likely that Congress was immunizing the government from liability for personal injuries apart from pure property costs--only the latter having been discussed in debates. The statutory language itself suggests this construction. It is elementary that the statutory provision is properly read as a whole. The immunity provision is only the first clause of a very long sentence, which continues in part: "Provided, however, that if ... lands in [a] stretch of river are subjected to overflow and damage which are not overflowed or damaged by reason of the construction of levees ..., the [Government shall] acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands." 33 U.S.C. Sec. 702c (1982) (emphasis in original). In juxtaposing the disclaimer and the proviso, we hark to the maxim noscitur a sociis (literally, "it is known from its associates"), which "acknowledges what general and specific words are associated with and take color from each other, restricting general words to a sense analogous [and] less general." Owen of Georgia, Inc. v. Shelby County, 648 F.2d 1084, 1092 (6th Cir.1981). This is a statute about damage to lands, not about people who are hurt or killed. This view is heightened by the fact that the House inserted "the latter part of the last paragraph of the section [i.e., the proviso] so as to clarify the meaning." 69 Cong.Rec. 8119 (1928)
 Of the twenty-three federal appellate cases directly construing and applying the immunity provision, twenty-one were brought to recover for damage to property. See Portis v. Folk Constr. Co., 694 F.2d 520 (8th Cir.1982) (damage to crops and land); Morici Corp. v. United States, 681 F.2d 645 (9th Cir.1982) (damage to corn crop); Pierce v. United States, 650 F.2d 202 (9th Cir.1981) (damage to land); Aetna Ins. Co. v. United States, 628 F.2d 1201 (9th Cir.1980) (damage of unspecified nature; no district court opinion reported; inferentially property damage), cert. denied, 450 U.S. 1025, 101 S.Ct. 1732, 68 L.Ed.2d 220 (1981); Burlison v. United States, 627 F.2d 119 (8th Cir.1980) (damage to land and crops), cert. denied, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981); Taylor v. United States, 590 F.2d 263 (8th Cir.1979) (damage to property); Lenoir v. Porters Creek Watershed Dist., 586 F.2d 1081 (6th Cir.1978) (damage to land); Hayes v. United States, 585 F.2d 701 (4th Cir.1978) (erosion and property damage); Miller v. United States, 583 F.2d 857 (6th Cir.1978) (loss of 6,000 square feet of lakefront land); Callaway v. United States, 568 F.2d 684 (10th Cir.1978) (damage to crops and property); Florida East Coast Ry. v. United States, 519 F.2d 1184 (5th Cir.1975) (damage to railroad); Graci v. United States, 456 F.2d 20 (5th Cir.1971) (damage to property); National By-Products, Inc. v. United States, 405 F.2d 1256, 186 Ct.Cl. 546 (1969) (damage to property); McClaskey v. United States, 386 F.2d 807 (9th Cir.1967) (damage to motel property); Amino Bros. Co. v. United States, 372 F.2d 485, 178 Ct.Cl. 515 (damage to property), cert. denied, 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967); Parks v. United States, 370 F.2d 92 (2d Cir.1966) (damage to property); Peterson v. United States, 367 F.2d 271 (9th Cir.1966) (damage to and loss of property); Stover v. United States, 332 F.2d 204 (9th Cir.) (damage to land), cert. denied, 379 U.S. 922, 85 S.Ct. 276, 13 L.Ed.2d 335 (1964); Tillman v. United States, 232 F.2d 511 (9th Cir.) (property damage), cert. denied, 352 U.S. 842, 77 S.Ct. 66, 1 L.Ed.2d 58 (1956); Clark v. United States, 218 F.2d 446 (9th Cir.1954) (damage to property); National Mfg. Co. v. United States, 210 F.2d 263 (8th Cir.) (property loss and damage), cert. denied, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108 (1954).
 The two others do not immunize the government from personal injury liability. In Wright v. United States, 568 F.2d 153 (10th Cir.1977), cert. denied, 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978), brought as a wrongful death action under the Federal Tort Claims Act, 28 U.S.C. Secs. 2671-80 (1982), after a bridge collapsed, the United States asserted Sec. 702c as a defense, but the court held the government immune on other grounds. 568 F.2d at 155. Similarly, in Lunsford v. United States, 570 F.2d 221 (8th Cir.1977), an action for damage to property and personal injury (including death), the court abstained from deciding the Sec. 702c question: "We agree that the defense [i.e., the governmental immunity] should remain but we do so without reaching the question of the scope of immunity under Sec. 702c on the merits." 570 F.2d at 229. The Lunsford court made no distinction between damage to property and injury to persons.
 
 
 [17]
 E.g., National Mfg. Co., 210 F.2d at 270; see Burlison v. United States, 627 F.2d 119, 121 (8th Cir.1980), cert. denied, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981); Lunsford v. United States, 570 F.2d 221, 227 (8th Cir.1977); Stover v. United States, 332 F.2d 204, 205 n. 1 (9th Cir.), cert. denied, 379 U.S. 922, 85 S.Ct. 276, 13 L.Ed.2d 335 (1964)
 
 
 [18]
 National Mfg. Co., 210 F.2d at 270; see also Morici Corp. v. United States, 681 F.2d 645, 647 (9th Cir.1982); Florida East Coast Ry. v. United States, 519 F.2d 1184, 1192 (5th Cir.1975); McClaskey v. United States, 386 F.2d 807, 808 (9th Cir.1967)
 
 
 [19]
 See Portis v. Folk Constr. Co., 694 F.2d 520 (8th Cir.1982); Burlison v. United States, 627 F.2d 119 (8th Cir.1980), cert. denied, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981); Taylor v. United States, 590 F.2d 263, 267 (8th Cir.1979) ("[S]ection 702c bars liability for damages that result (even indirectly) from floods." (quotation marks omitted)). But see Lunsford v. United States, 570 F.2d 221 (8th Cir.1977) (citing the conflict between National Mfg. and Peterson v. United States, 367 F.2d 271 (9th Cir.1966), and refusing to endorse either the wholesale immunity, on the one hand, or the "wholly unrelated" doctrine, on the other, without the benefit of a full record)
 
 
 [20]
 Parks v. United States, 370 F.2d 92 (2d Cir.1966)
 
 
 [21]
 Graci v. United States, 456 F.2d 20, 26 (5th Cir.1971) (quoting the opinion below, 301 F.Supp. 947, 952 (E.D.La.1969))
 
 
 [22]
 Id. at 27 (quoting the opinion below, 301 F.Supp. 947, 954 (E.D.La.1969))
 
 
 [23]
 Courts that have previously considered the question have somehow been persuaded that the 1936 National Flood Control Act did re-enact section 702c. This line of holdings began with National Mfg. Co. v. United States, 210 F.2d 263, 270 (8th Cir.), cert. denied, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108 (1954), in which the court paraphrased 33 U.S.C. Sec. 701e:
 Nothing in this Act shall be construed as repealing or amending any provisions of the Act entitled 'An Act for the control of floods on the Mississippi River and its tributaries, and for other purposes,' approved May 15, 1928, or any provision of any law amendatory thereof.
 We cannot see how refraining from repealing or amending a statute dealing with the Mississippi River and its tributaries in any way re-enacts all the provisions of the prior statute into the later one. Yet the National Mfg. court, using the above quotation, wrote: "Congress ... affirmed the application to the 1936 Act of the general provision of the 1928 Act, including [Sec. 702c]." 210 F.2d at 270. Other courts have relied largely on this enigmatic analysis.
 The 1936 Act has its own immunity provision in 33 U.S.C. Sec. 701c (1982), which has remained unamended. This disclaimer might be read as fulfilling the same legislative intent as that in the 1928 statute, but as being much more specific and comprehensive in revealing that intent:
 [N]o money appropriated under authority of section 701f of this title shall be expended on the construction of any project until States, political subdivisions thereof, or other responsible local agencies have given assurances satisfactory to the Secretary of the Army that they will ... hold and save the United States free from damages due to the construction works.
 33 U.S.C. Sec. 701c(b) (1982).
 Congress would have been unlikely to place two governmental immunity provisions in the same statute. To read Sec. 702c of the 1928 Act into the 1936 Act makes Sec. 701c(b) redundant; the Supreme Court disapproves of such readings. Singer v. United States, 323 U.S. 338, 344, 65 S.Ct. 282, 285, 89 L.Ed. 285, 290 (1945). Furthermore, Congress in 1936 could have expressly adopted the Sec. 702c disclaimer, but it did not.
 
 
 [24]
 Shakespeare, aptly using flooding as the metaphor, made virtually the same point about the overbroad remedy for a specific problem: "What need to bridge much broader than the flood?/ The fairest grant is the necessity./ Look what will serve is fit." W. Shakespeare, Much Ado About Nothing, I, i. 316-18
 
 
 [25]
 This "wholly unrelated" doctrine has subsequently been applied in Morici Corp. v. United States, 681 F.2d 645 (9th Cir.1982), and in Lunsford v. United States, 570 F.2d 221, 229 (8th Cir.1977)
 
 
 [26]
 We mark the Supreme Court's pronouncement that "[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." American Tobacco Co. v. Patterson, 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748, 756-57 (1982)
 
 
 [1]
 I am unable to see what "purposes of recreation" adds to or takes from the court's formulation. I doubt that a court, disposed as this one appears to be, would deny recovery, for example, to a motorist with a steaming radiator who was overwhelmed by flood waters while attempting to dip a can of water from the stream below a dam--scarcely a "recreational" purpose
 
 
 [2]
 For I see no way to distinguish between damage to the hypothetical motorist of note 1 and damage to his stalled automobile
 
 
 [3]
 For example, Representative Snell of New York, in a passage quoted by the majority at 598, stated:
 I want this bill so drafted that it will contain all the safeguards necessary for the Federal Government. If we go down there and furnish protection to these people--and I assume it is a national responsibility--I do not want to have anything left out of the bill that would protect us now and for all time to come. I for one do not want to open up a situation that will cause thousands of lawsuits for damages against the Federal Government in the next 10, 20, or 50 years.
 
 
 [69]
 Cong.Rec. 6641 (1928)
 It is true that this passage is preceded by one treating of land acquisition. Representative Snell's quoted references to "for all time to come" and to lawsuits over the "next 10, 20, or 50 years" plainly indicate to me, however, that his apprehensions extended beyond the initial land condemnations for levee and by-pass locations.
 
 
 [4]
 Nor does the court's reliance on the absence of a general federal torts claims act at the time Sec. 702c was enacted seem to me sound. More than one waiver of immunity in a specific area had been enacted before Sec. 702c--such as the Suits in Admiralty Act, 46 U.S.C. Sec. 741-752--and a general torts claims act had been under active consideration by the Congress since the times of World War I. See Dalehite v. United States, 346 U.S. 15, 24, 73 S.Ct. 956, 962, 97 L.Ed. 1427 (1953). Driving down a clear stake in such a dangerous area might well have been seen by the Congress as wise
 
 
 [5]
 See note 3 above
 
 
 [1]
 The result of the court's holding today is that the Federal Tort Claims Act controls. The refusal to consent to liability for discretionary acts of governmental representatives in that act confines its result. Indeed, Congress considered flood control projects in passing that act
 See H.R.Rep. No. 2245, 77th Cong., 2d Sess., p. 10; S.Rep. No. 1196, 77th Cong., 2d Sess., p. 7; H.R.Rep. No. 1287, 79th Cong., 1st Sess., pp. 5-6; Hearings before House Com. on Judiciary on H.R.5373 and H.R.6463, 77th Cong., 2d Sess., p. 33. The paragraph reads as follows:
 Section 402 specifies the claims which would not be covered by the bill.
 The first subsection of section 402 exempts from the bill claims based upon the performance or nonperformance of discretionary functions or duties on the part of a Federal agency or Government employee, whether or not the discretion involved be abused, and claims based upon the act or omission of a Government employee exercising due care in the execution of a statute or regulation, whether or not valid. This is a highly important exception, intended to preclude any possibility that the bill might be construed to authorize suit for damages against the Government growing out of an authorized activity, such as a flood-control or irrigation project, where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious, or that the statute or regulation authorizing the project was invalid.
 Dalehite v. United States, 346 U.S. 15, 29 n. 21, 73 S.Ct. 956, 964 n. 21, 97 L.Ed. 1427 (1942).
 
 
 [2]
 "If there is any inconsistency or illogic in all this, it is an inconsistency and illogic of long standing that is to be remedied by the Congress and not by this Court." Flood, 407 U.S. at 284, 92 S.Ct. at 2112-13